[Cite as *State v. Harris*, 2026-Ohio-2627.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case Nos.   24CA4067 |
| Plaintiff-Appellee, | : | 24CA4068 |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| CORNELIUS HARRIS, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | |
| | : | **RELEASED: 06/25/2026** |

APPEARANCES:

Karyn Justice, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Wilkin, J.

**{1}** This is a consolidated appeal in which Cornelius Harris ("Harris") appeals two Scioto County Court of Common Pleas judgment entries where he was convicted of two counts of felonious assault, second-degree felonies, and three counts of possession of a deadly weapon while under detention, second-degree felonies. On appeal Harris contends the trial court erred by consolidating his two cases for trial, denying his motion to compel discovery, denying his motion to continue the jury trial, and failing to waive court costs. He also claims that his convictions are not supported by the manifest weight of the evidence, and that his sentence is contrary to law. After reviewing the parties' arguments, the record, and the applicable law, we find no merit to any of the assignments of error and affirm the judgments of the trial court.

BACKGROUND

{2} On February 2, 2022, a Scioto County grand jury returned two separate indictments in Case Nos. 22CR43 and 22CR44.  On January 5, 2023, at the State's request, and over Harris' objection, the trial court consolidated the cases.  On March 11, 2024, the morning of trial, the indictment in Case No. 22CR44 was amended by agreement such that the matter proceeded on the following five felonies:  two counts of felonious assault, second-degree felonies, in violation of R.C. 2903.11(A)(2) and (D)(1)(A), and three counts of possession of a deadly weapon while under detention, second-degree felonies, in violation of R.C. 2923.13(B) and (C)(2)(b)(i).

{3} After a two-day trial, during which Harris represented himself, the jury returned guilty verdicts on all counts.  The trial court sentenced Harris to serve a definite prison term of 8-12 years for the two felonious assault convictions, and 8 years on each possession of a deadly weapon while under detention conviction. The trial court further ordered each sentence to be served consecutively for a total prison term of 40-48 years.  Additionally, the trial court ordered Harris to pay the costs of the proceeding.

{4} Harris submitted this timely appeal with six assignments of error.

ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT ERRED WHEN IT CONSOLIDATED
        22CR43 AND 22CR44 AT TRIAL.

II.     THE TRIAL COURT ERRED WHEN IT DENIED
        APPELLANT'S MOTION TO COMPEL DISCOVERY.

III.    THE TRIAL COURT ERRED WHEN IT DENIED
        APPELLANT'S MOTION TO CONTINUE THE JURY TRIAL.

IV.     APPELLANT'S CONVICTIONS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF SUFFICIENT EVIDENCE.

V.     APPELLANT'S SENTENCE IS CONTRARY TO LAW.

VI.     THE COURT ERRED WHEN IT FAILED TO WAIVE THE REQUIREMENT THAT APPELLANT PAY COURT COSTS.

FIRST ASSIGNMENT OF ERROR

{5} Harris contends in his first assignment of error that consolidating these two distinct incidents prejudiced him because it created the cumulative effect in the jurors' minds tending to prove him guilty of each act. He asserts the evidence in these matters was confusing and prejudicial. Specifically, he states that because evidence of the April 12, 2021 incident was not corroborated by video evidence, it was used to support the other allegations, and, as a result, he received an unfair trial.

{6} The State argues the cases were properly tried together because Ohio law favors joining multiple offenses in a single trial if the offenses are of a similar character. It further asserts that Harris had not shown prejudice as the evidence was simple and direct and the evidence would have been properly admitted as other acts evidence in any event.

A. Law

{7} Generally, appellate courts review a trial court's decision on joinder and severance of offenses for trial under an abuse-of-discretion standard. *State v. Pleasant,* 2025-Ohio-115*, ¶* 78 (4th Dist.), citing *State v. Gideon,* 2021-Ohio-1863, ¶ 5 (3d Dist.)*.* "An abuse of discretion implies that a court's attitude is unreasonable, arbitrary or unconscionable." *State v. Grover,* 2025-Ohio-5875,

¶ 16 (4th Dist.), citing *State v. Hall*, 2025-Ohio-3199, ¶ 55 (4th Dist.), citing *State v. Beasley*, 2018-Ohio-16, ¶ 12.

{**8**} "A trial court has authority to join two indictments for a consolidated trial pursuant to Crim.R. 13." *State v. Parham* at 2019-Ohio-358, ¶ 17 (10th Dist.). Crim.R. 13 provides, "[t]he court may order two or more indictments * * * to be tried together, if the offenses or the defendants could have been joined in a single indictment or information." Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct." Thus, " '[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. McGee,* 2010-Ohio-2081, ¶ 22 (8th Dist.), quoting *State v. Lott* , 51 Ohio St.3d 160, 163 (1990). "This is because joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.' " *State v. Gordon,* 2018-Ohio-259, ¶ 18, quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968).

{**9**} Even so, Crim.R. 14 provides that ""[i]f it appears that a defendant * * * is prejudiced by * * * joinder for trial together of indictments, * * * the court shall order an election or separate trial of counts * * *or provide such other relief as justice requires." A defendant claiming that a trial court erred in not allowing separate trials of multiple charges under Crim.R. 14 "has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial

court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial * * *." *State v. Pleasant,* 2025-Ohio-115, ¶ 80 (4th Dist.),quoting *State v. Torres*, 66 Ohio St.2d 340, (1981), at the syllabus. " '[C]laims of prejudice are less persuasive where the evidence is 'amply sufficient to sustain each verdict, whether or not the indictments were tried together.' " *State v. Powers,* 2020-Ohio-7042, ¶ 33 (4th Dist.) quoting *State v. Sapp*, 2004-Ohio-7008, ¶ 73, citing *Torres* at 66 Ohio St.2d at 344.

{10} Even if a defendant asserts that joinder would prejudice his rights, the State can still overcome that claim in certain instances. *State v. Grover,* 2025-Ohio-5875, (4th Dist.) ¶ 20; *State v. Lott,* 51 Ohio St. 3d 160, 163 (1990). The State can overcome an initial showing of prejudice against joinder if the State demonstrates either: (1) it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B) (the other-acts test); or (2) the "evidence of each crime joined at trial is simple and direct" (the joinder test). *Id.*, citing *State v. Lott*, 51 Ohio St.3d at 163. The State does not have to satisfy both of these tests; satisfying either test negates a defendant's claim of prejudice without consideration of the other. *Id.* citing *State v. Wright*, 2017-Ohio-8702, ¶ 51 (4th Dist.). Thus, if the State can meet the joinder test, we need not consider a defendant's argument under the other-acts test. *See State v. Sims,* 2023-Ohio-1179, ¶ 39 (4th Dist.), citing *State v. Johnson,* 88 Ohio St.3d 95, 109 (2000) ("[i]f the [S]tate can meet the joinder test, it need not meet the stricter 'other acts' test.' ") *See also State v. Evans,* 2012-Ohio-1562, ¶ 37 (4th Dist.)(when the joinder test was satisfied, the court did not consider the argument under the

other-acts test); *State v. Sullivan,* 2011-Ohio-6384, ¶ 23, 28 (10th Dist.) (because "other-acts" test had been satisfied to rebut the defendant's claim of prejudicial joinder, the court was not required to consider the less stringent "joinder test.").

{11} The joinder test is determined by assessing whether "(1) the jury is capable of readily separating the proof required for each offense; (2) the evidence is unlikely to confuse the jurors; (3) the evidence is straightforward and easy to understand; (4) the offenses involve different victims, different incidents, and different witnesses; and (5) little danger exists that the jury would improperly consider testimony on one offense as corroborative of the other." *Grover,* 2025-Ohio-5875, ¶ 21 (4th Dist.) citing *State v. Freeland*, 2015-Ohio-3410, ¶ 14 (4th Dist.); *accord State v. Pate*, 2021-Ohio-1838, ¶ 57 (2d Dist.); *State v. Wright*, 2017-Ohio-8702, ¶ 52 (4th Dist.); *State v. Dantzler*, 2015-Ohio-3641, ¶ 23 (10th Dist.); *State v. Clifford*, 135 Ohio App.3d 207, 212 (1st Dist. 1999). Moreover, " ' "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." ' " *Grover* at ¶ 21, quoting *State v. Echols*, 2015-Ohio-5138, ¶ 16 (8th Dist.), quoting *State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).

B.  Analysis.

{12} On November 9, 2022, the State filed a motion to consolidate the cases.  The trial court heard the motion on December 27, 2022.  The defense objected to the State's motion to consolidate.  The trial court granted the motion to consolidate, reasoning that, in some instances, the evidence for one would be the same as that for the other case.   The trial court further explained that Harris

allegedly used the same kind or similar homemade weapons in both cases while in detention, making other-acts evidence potentially admissible to address issues of intent and mistake of fact. The trial court also determined the evidence was simple and "distinct" for each count. In addition, to protect Harris' right to fair trial, the trial court told the parties it would give a jury instruction that explained each count was "separate" and "distinct." The instruction provided to the jury stated:

> The offenses set forth in each count of each indictment constitute separate and distinct matters. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict on the other counts. The defendant may be found guilty or not guilty of any one or all of the offenses charged.

{13} Here, the trial court did not abuse its discretion in consolidating the cases. The record shows that the evidence for each offense, which were close to two weeks apart, was readily separated into the proof required for each offense. Harris acknowledged at the motion to consolidate hearing that the matters could have been indicted together in the first instance. Furthermore, the evidence was clear for each offense, and not easily confused, or hard to understand as separate acts. The offenses also involved different victims, different incidents, and different witnesses. Harris has not shown how the trial court abused its discretion, nor that he was prejudiced by the consolidation of the offenses. Clearly, a review of the record shows the State presented the evidence in such a manner that the jury could easily have kept the acts themselves separate and the acts involved separate victims without significant overlap or

conflation of proof.  Therefore, we find no error and overrule the first assignment of error.

SECOND ASSIGNMENT OF ERROR

{14} In his second assignment of error, Harris claims that the trial court erred when it denied his motion to compel discovery.  While he acknowledges that it is ordinarily the defendant's burden to prove withheld evidence is materially exculpatory, he asserts that he was prejudiced here because he was prevented from identifying potential witnesses and evidence that would assist in his defense.  He states that the failure to provide an inmate's legal name prevented him from being able to subpoena that person.  He also avers that the State's failure to provide grievances he filed prevented him from showing bias, and his not having access to the victims' medical records also frustrated his ability to defend himself.  He further asserts the trial court should have granted his motion to compel by continuing the trial as a sanction, arguing that the State provided some video evidence only a short time before the trial.

{15} The State responds that Harris did not make any reasonable effort to resolve the discovery dispute before filing his motion to compel.  Additionally, the State contends that Harris did not show how any of the remaining requested items contained information favorable to the defense or material to the facts at issue.  Thus, the State claims the trial court did not err in denying the motion to compel.

A.  Law

{16} Crim.R. 16 governs discovery in criminal cases. The purpose of the rule "is to provide all parties in a criminal case with the information necessary for

a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A); *State v. Webb*, 2023-Ohio-4050, ¶ 29 (4th Dist.).

**{17}** Crim.R.16(L), "Regulation of Discovery" provides:

(1) The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

**{18}** "A trial court enjoys considerable discretion in regulating the exchange of discovery." *State v. Scullin,* 2019-Ohio-3186, ¶ 114 (8th Dist.), citing *State ex rel. Daggett v. Gessaman*, 34 Ohio St.2d 55, 57 (1973). " 'Sanctions for a Crim.R. 16 discovery violation are within the discretion of the trial court and should be imposed equally, without regard to the status of the offending party.' " *State v. Armstrong,* 2025-Ohio-2609, ¶ 35 (2d Dist.), quoting *State v. Darmond*, 2013-Ohio-966, ¶ 20. Therefore, generally, " '[t]he trial court's response to an alleged discovery violation under Crim.R. 16 is reviewed for an abuse of discretion.' " *Armstrong* at ¶ 36, quoting *State v. Miller*, 2023-Ohio-2508, ¶ 41 (2d Dist.); *State v. Webb,* 2023-Ohio-4050, ¶ 30 (4th Dist.); *State v. Jenkins,* 2007-Ohio-7180 (4th Dist.).

**{19}** However, in the case sub judice, Harris challenges, for the most part, the trial court's ruling as violating the principles set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* claim raises issues of due process that are mixed

questions of law and fact, such that the appellate standard of review is de novo. *State v. Green,* 2024-Ohio-3260, ¶ 22 (1st Dist.), citing *State v. Smith*, 2018-Ohio-4691, ¶ 24-25 (2d Dist.); *State v. Smith,* 2024-Ohio-5168, ¶ 97 (4th Dist.) ("Whether withheld evidence is material under *Brady* is a matter of law for which the de novo standard of review applies.").  Thus, because the crux of Harris' argument is that the State failed to provide documents or items that he claims contained *Brady* material, we conduct a de novo review.[1]

**{20}** The United States Supreme Court has held that a state violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by suppressing evidence favorable to the accused where the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. at 87; *State v. Brown,* 2024-Ohio-749, ¶ 30; *State v. Lemaster,* 2025-Ohio-5621, ¶ 61 (4th Dist.).  "To establish a *Brady* violation, a defendant must demonstrate (1) that the evidence is favorable to the defendant, because it is either exculpatory or impeaching, (2) that the evidence was willfully or inadvertently suppressed by the [S]tate, and (3) that the defendant was prejudiced as a result."  *Brown* at ¶ 30, citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *Lemaster* at ¶ 62.

**{21}** "Evidence is material--or prejudicial—" ' "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding

---

[1] In his Second Assignment of Error, while Harris indicates the trial court erred in overruling his motion to compel pursuant to *Brady v. Maryland*, he also refers to Crim.R. 16(L), regarding the trial court's denial of his motion to continue the day of the trial.  However, Harris' motion to compel was filed on May 24, 2022 and ruled upon, after the hearing on December 29, 2022. While the record shows Harris did move the trial court for a continuance the day of trial based on discovery issues, he did not specifically request a continuance as a sanction for a Crim.R. 16 violation, per se.  We address the trial court's denial of his motion to continue in our analysis related to his Third Assignment of Error.

would have been different." ' " " *Id.,* quoting *Turner v. United States*, 582 U.S. at 324, quoting *Cone v. Bell*, 556 U.S. 449, 469-470 (2009). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Dodridge,* 2025-Ohio-2856, ¶ 71 (4th Dist.), quoting *State v Johnston*, 39 Ohio St.3d 48, 61 (1988), quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Mere speculation does not meet the accused's burden to show that the withheld evidence is material." *State v. Sharma,* 2021-Ohio-3436, ¶ 31 (5th Dist.); citing *State v. Qirat*, 2015-Ohio-863, ¶ 41 (5th Dist.), citing *State v. Davis,* 2008-Ohio-2, ¶ 339; *State v. Rivas,* 2009-Ohio-1354, ¶ 14; *State v. Jackson,* 57 Ohio St.3d 29, 33 (1991), quoting *United States v. Agurs* 427 U.S. 97, 109-110 (1976).

{¶22} Ordinarily, a defendant bears the burden to prove that withheld evidence is materially exculpatory. The burden shifts to the State if a defendant has requested a particular item of evidence and that item later is lost or destroyed. *Dodridge* at ¶ 73; *State v. Blanton,* 2018-Ohio-1278, ¶ 88 (4th Dist.). However, the burden only shifts to the State if the defendant made a specific request for that particular item. *Id.* Hence, when " 'evidence is destroyed pursuant to routine procedures before any request for it has been made, it is not the State's burden to show that the evidence was not exculpatory, but rather [the] [d]efendant's burden to show that it was exculpatory.' " *Dodridge* at ¶ 73, quoting *State v. Terry*, 2004-Ohio-7257, ¶ 15 (2d Dist.).

B.  Analysis.

**{23}** In the instant case at trial and on appeal, Harris maintains that the State did not produce several items of discovery that prejudiced him:  (1) personnel files of the Southern Ohio Correctional Facility ("SOCF") staff involved in the incidents; (2) grievances that he filed against the officers; (3) video and audio recordings that record "harassment and threats he received" leading up to the indicted offenses; (4) unit rosters from SOCF to identify potential witnesses; and (5) medical records of the victims of the offenses related to the incidents.

**{24}** We first address Item 5, the medical records of the victims of the offenses.  A review of the record shows that both of the victims in each case went to Southern Ohio Medical Center ("SOMC") for their injuries, and victim J.M. also went to Grant Hospital.  The record is clear that the State provided information in discovery that these victims received medical treatment or consultation at both the prison infirmary and these hospitals.  In fact, the State provided the medical records from SOMC for both victims in initial discovery and supplemented discovery with J.M.'s hospital visit to Grant Hospital.  Further, it appears that only C.B.'s SOMC medical records were admitted as exhibits at trial.  Thus, Harris cannot show any error regarding this discovery.

**{25}** Neither party asserts that Items 1, 2, 3, and 4, which Harris sought in his motion to compel, were not in the State's possession.  The State replied that there was "no *Brady* material," allowing Harris to demonstrate that the State did not provide it.

**{26}** As to Item 1, the staff personnel records, at the hearing on Harris' motion to compel, Harris argued that he sought the personnel files of the SOCF staff involved in the incident because he wanted to present evidence or assess whether that staff had "issues" with other inmates or with Harris personally, and also to challenge the victims' credibility. However, he cannot demonstrate how the evidence is favorable to him because it is either exculpatory or impeaching, or that he was prejudiced as a result. Instead, his claims are mere speculation.

**{27}** As to Item 2, the State acknowledged it had grievances Harris filed against the officers, including "use of force" reports, but did not provide them, claiming they contained no exculpatory information. Harris claimed that information was pertinent to show a "pattern of conduct" of the officers. But after discussions, the trial court observed that those records would most likely *hurt* rather than assist Harris' defense. Again, Harris merely asserts that these records are exculpatory. The State also informed the trial court that it had provided the use of force reports related to the indicted offense, including ODRC and OSHP records.

**{28}** As to any audio or video (Item 3) of any alleged "harassment" or "threats" directed toward Harris before the indicted offenses, Harris requested two specific instances at the hearing: a phone call, where he was allegedly harassed by corrections officers, and an incident where he was forced to cut his hair. However, when asked to clarify the timing of these incidents, Harris was vague and failed to show how they were related to the indicted incidents.

**{29}** Finally, as to Item 4, Harris requested "unit rosters" so that he could identify potential witnesses. He claims that an inmate nicknamed "Frost" told him that special response team members were destroying his property during a shakedown. Harris claims that because he was not able to obtain the roster information, he was unable to subpoena this inmate to testify on his behalf. However, he does not assert how this testimony would provide him with a defense to the charge. In fact, even assuming that an inmate testified that the corrections officers were destroying his property and that Harris knew it, that would seem to give him a motive to assault the officers.

**{30}** In sum, Harris has not shown how Items 1-4 were exculpatory or material. As to Item 5, the record reflects that the State provided the Grant Hospital records to Harris' counsel in discovery. We, therefore, overrule the second assignment of error as it lacks merit.

## THIRD ASSIGNMENT OF ERROR

**{31}** Harris states in his third assignment of error that the trial court erred when it denied his motion to continue the jury trial. He asserts that the trial court abused its discretion in denying his request and he was also prejudiced because he had no opportunity to identify and obtain witnesses. He also contends that his request was not a tactical delay.

**{32}** The State argues that the cases had multiple continuances over a two-year time period and that Harris made most of those requests. The State maintains that Harris requested he be allowed to represent himself, and the trial court allowed that request. However, the trial court denied Harris' motion to

continue the trial because of the delay in the proceedings up to that point; discovery had been completed two years prior; and State witnesses and the jurors were in the courthouse waiting for the proceedings. Therefore, the State maintains the trial court did not abuse its discretion in denying Harris' motion to continue the trial.

### A. Law

**{33}** " 'The determination whether to grant a continuance is entrusted to the broad discretion of the trial court.' " *State v. Thompkins,* 2024-Ohio-4927, ¶ 18 (4th Dist.), quoting *State v. Froman*, 2020-Ohio-4523, ¶ 91, citing *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. "Thus, we will not reverse a trial court's decision unless [an appellant] demonstrates the trial court abused its discretion." *Id.,* citing *State v. Myers*, 2018-Ohio-1903, ¶ 92. Additionally, Harris " 'must show how the denial of a continuance prejudiced him.' " *Id.,* quoting *Myers* at ¶ 92, citing *State v. Broom*, 40 Ohio St.3d 277, 288 (1988).

**{34}** "A trial court that considers a motion to continue should " '[w]eigh[ ] against any potential prejudice to the defendant * * * concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.' " *State v. Woodfork,* 2025-Ohio-2786, ¶ 17 (4th Dist.), quoting *Unger* at 67. Therefore, when evaluating a request for a continuance, a court should also consider, inter alia:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons to whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.*, quoting *Unger* at 67-68.

### B.  Analysis.

{35} In the instant case, Harris requested a continuance of the two-year-old case the morning of trial.  The notice of hearing for the trial itself had been issued by the trial court three months prior.  At the time of Harris' motion to continue, at least 30 prospective jurors had been assembled at the courthouse and the State had subpoenaed its witnesses.  According to Harris and his second defense counsel, he received some items of discovery the week prior to trial and wished to continue the trial because Harris had not had time to discuss the discovery with his counsel.  Harris also claimed he had not personally had enough time to review the discovery, and, further, that he still had not received some of the items he requested in discovery.  He argued that some of the video evidence had been provided a few days prior to trial, and also that there was some mix-up in that photographs of the weapons related to one case had been provided twice instead of photographs of all three weapons, which problem had also been remedied a few days prior.  The State responded that the descriptions of what would be observed on the video and the incident itself was provided in the core discovery many months prior.

{36} The trial court heard from both the State and defense counsel as well as Harris himself, then made certain inquiries.  After the matter was discussed for some time, the trial court denied the motion to continue, stating the reasons for its decision.  First, the trial court observed that the trial had been continued several times over the past two years, mostly at the request of the defense.

Second, the trial court indicated that several jurors and other interested persons were already present and awaiting the commencement of the trial.  Finally, the trial court indicated that discovery had, for the most part, been completed two years prior, and that the discovery that Harris claimed had never been provided had been addressed by the trial court during a motion to compel hearing some time before.  The trial court elaborated, noting that many of the items that Harris requested a continuance to obtain were either determined to be irrelevant or were not discoverable under Crim.R. 16.  Further, the record shows that the State provided the core discovery to defense counsel in March 2022, June 2022, and supplements in September 2023.

{37} Harris argues on appeal that the trial court abused its discretion when Harris requested he be allowed a continuance so he could represent himself at trial.  Harris' first counsel was appointed formally on March 7, 2022.  When Harris requested new counsel in January 2023, he did not ask to represent himself. The trial court appointed Harris' second counsel on June 15, 2023.  Harris did not request to represent himself until the trial court denied his second counsel's motion to continue the trial, the day of the jury trial on March 11, 2024.  In the almost nine-month period from the time his second counsel was appointed, Harris neither requested new counsel, nor that he be allowed to represent himself.  Because the majority of discovery had been completed two years prior, and Harris had over two years to request that he represent himself, the trial court's denial of a continuance was not an abuse of discretion, especially since his previous counsel served as standby counsel during the trial.

**{38}** Additionally, Harris at trial and on appeal claims that he did not have time to consult with his court-appointed counsel, but the record shows that there was some time in which counsel had time to consult with Harris.

**{39}** Harris has not demonstrated he was prejudiced in any way by the trial court's decision to deny the continuance. The record demonstrates that Harris fully cross-examined the witnesses regarding the few items of discovery that were provided a week prior to trial. Thus, we cannot find based on the record that the trial court abused its discretion and therefore overrule Harris' third assignment of error.

FOURTH ASSIGNMENT OF ERROR

**{40}** In his fourth assignment of error, Harris declares that his convictions for felonious assault are against the manifest weight of evidence. Specifically, Harris claims that he did not act "knowingly." Rather, he claims, it was not his intention to hurt anyone. In his argument, he also asserts that the evidence is not sufficient for a conviction.

**{41}** The State argues both manifest weight and sufficiency together, and that under either analysis, this assignment of error should be denied.

A. Law

**{42}** "In general, a claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. King,* 2022-Ohio-4616, ¶ 22 (4th Dist.), citing *State v. Schroeder*, 2019-Ohio-4136, ¶ 59 (4th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Thus, "[w]hether the evidence is legally sufficient to sustain a conviction is a question of law that this court reviews

de novo." *State v. Brown,* 2025-Ohio-2804, ¶ 16, citing *State v. Groce*, 2020-Ohio-6671, ¶ 7. Viewing the evidence in the light most favorable to the prosecution the court asks whether " 'any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.' " *Id.*, quoting *State v. Dean*, 2015-Ohio-4347, ¶ 150, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Accordingly, "[t]he appropriate standard of review for a sufficiency-of-the-evidence challenge is 'whether, if believed, the evidence can sustain the verdict as a matter of law.' " *Id.* at ¶ 17, quoting *State v. Richardson*, 2016-Ohio-8448, ¶ 13.

{43} However, in a manifest-weight-of-the-evidence challenge, the court sits as the "thirteenth juror," and looks at the entire record to weigh the evidence and all reasonable inferences. *State v. Brown,* 2025-Ohio-2804, ¶ 30. In so doing, the court "considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered,' " *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). An appellate court "will vacate a jury's verdict and order a new trial " " 'only in the exceptional case in which the evidence weighs heavily against the conviction,' " *Brown* at ¶ 31, quoting *Thompkins* at 387, quoting *Martin* at 175. Courts, therefore, "review the record to determine whether the 'jury clearly lost its way.' " *Id.,* quoting *Thompkins* at 387.

**{44}** Even so, we observe it is the role of the jury to determine the weight and credibility of evidence. *State v. Schluep,* 2025-Ohio-5866, ¶ 22 (4th Dist.) " ' "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." ' " *Id.,* quoting *State v. Reyes-Rosales*, 2016-Ohio-3338, ¶ 17 (4th Dist.), quoting *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.). The trier of fact should be accorded deference in evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Schluep* at ¶ 22.

**{45}** We further observe that " '[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *State v. Neff,* 2025-Ohio-1171, ¶ 46, (4th Dist.), quoting *State v. Gravely*, 2010-Ohio-3379, ¶ 46 (10th Dist.), citing *State v. Braxton,* 2005-Ohio-2198, ¶ 15 (10th Dist.), citing *State v. Roberts*, 1997 WL 600669 (9th Dist. Sept. 17, 1997). Hence, " 'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *Gravely* at ¶ 46; *State v. Wickersham*, 2015-Ohio-2756, ¶ 27, (4th Dist.) citing *State v. Pollitt*, 2010-Ohio-2556, ¶ 15 (4th Dist.). We, therefore, " "first examine whether appellant's convictions are supported by the manifest weight of the evidence.' " *Id.* quoting *Gravely* at ¶ 46, citing *State v. Sowell,* 2008-Ohio-3285, ¶ 89 (10th Dist.).

B.  Analysis.

**{46}** Harris was convicted of two counts of second-degree felonious assault and three counts of the second-degree felony possession of a deadly weapon while under detention.   R.C. 2903.11(A)(2) provides  "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."  R.C. 2903.11(D)(1)(a) states "[w]hoever violates this section is guilty of felonious assault * * * a felony of the second degree."  R.C. 2903.11(E)(1) provides that "deadly weapon," as used in R.C. 2903.11, has the same meaning as in R.C. 2923.11.  R.C. 2923.11(A) states that "deadly weapon" "means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

**{47}** Harris questions the jury's conclusion that he acted "knowingly" when he committed felonious assault.  R.C. 2901.22(B) states:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{48}** "A finder of fact may infer a defendant's intent to cause physical harm from his actions and the surrounding circumstances."  *State v. Hulbert,* 2023-Ohio-4502, ¶ 41 (7th Dist.), citing *State v. Seiber*, 56 Ohio St.3d 4, 15 (1990).  "Because a defendant's intent dwells in his mind, the surrounding facts, circumstances, and resulting inferences are the traditional indicators of a

defendant's intent." *Id.* citing *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001). " '[T]he jury, unable to enter the mind of another, is required to consider common sense, causal probabilities in considering whether the defendant acted "knowingly." ' " *State v. Pennington,* 2024-Ohio-5681, ¶ 85 (4th Dist.), quoting *State v. Kelly*, 2012-Ohio-523, ¶ 23 (11th Dist.).

{49} The State separately adduced evidence for each assault. Both assaults occurred at Southern Ohio Correctional Facility (SOCF), a maximum security facility, in the restricted J-1 unit. Harris had been incarcerated there based on his conviction for first-degree felony aggravated robbery (among other things).

{50} On March 31, 2021, the special response team ("SRT") members were called to shakedown inmate Harris' cell. During the shakedown, Harris was taken out of his cell and put into a holding cell. As SRT member Parish was putting Harris back into his cell, Harris walked toward the back of the cell and then came back forward. When Parish stuck the handcuff key in to unlatch one of the sides of Harris' handcuffs, Harris pulled away, breaking the handcuff key, which resulted in a small cut to Parish's hand. Harris then went to the back of the cell and said, "bitch, I'll throw these cuffs in your face," while simultaneously attempting to slip the cuffs off with his right hand. Parish then deployed OC (pepper spray) and went to the infirmary for the cut to his hand. Parish had no more contact with Harris that day and had not interacted with him before that date.

**{51}** C.B., also a member of the special response team, heard a commotion that involved Parish. C.B. noted that Harris had taken a handcuff and would not turn it over to officers. C.B. saw that Parish had a cut to his hand. Even though several officers directed Harris to release the handcuff, Harris failed to comply. That same day, the SRT members received orders to remove Harris to a different cell. Harris refused to be moved. He was irate, screaming and yelling that he wanted to "kill people." Then Harris' demeanor changed markedly. He spoke in a calm voice to SRT member Lieutenant Taylor, saying, "let's talk about this." Harris attempted to lure Taylor to come closer. At that time, Harris had his hands behind his back, facing the back of the cell. SRT staff, including C.B., SRT member Sammons, and Taylor were attempting to get Harris to comply. Generally, when an inmate "cuffs up," the inmate turns around so his back is to the officers, and then the inmate is required to walk backward slowly and place their arms through the cuff port, or hatch (where inmates receive food or have their handcuffs applied) slowly to allow officers to handcuff the inmate.

**{52}** In this instance, it appeared Harris was starting to comply by facing the back of the cell and speaking in a calmer tone. However, in a split second, Harris suddenly turned and pulled a homemade weapon from his waistband with his right hand and jabbed the makeshift knife through the cuff port. C.B. was struck with the knife, which went through the latex gloves he was wearing, and required medical attention at the prison infirmary. Infirmary personnel later sent C.B. to SOMC to prevent the development of an infection. While the wound was superficial, it still bled. It was not until after Harris cut C.B., that Sammons drew

the PR-24 (baton used for law enforcement).  In an effort to defuse the situation, Sammons deployed pepper spray to get the weapon out peacefully.  That same day, Harris told Sammons that he was "tired of doing time at Lucasville," and that he "wanted to kill" a staff member or an SRT member, as well as other threats.

{53} The homemade weapon that Harris used in this March incident consisted of sharpened metal that exceeded nine inches and was also made with a Brillo pad and a cotton handle torn from a prison bedsheet.  The metal part was used as a shank, with the sharp edge exposed.

{54} The other incident occurred on April 12, 2021.  That morning, corrections officer Richardson and corrections officer J.M. attempted to feed Harris.  The second J.M. went to unlock the cuff port or hatch to retrieve a cup for coffee from the cell, a hand came out and stabbed J.M.  J.M. jumped to the side, and the cuff port was slammed shut.  It happened so fast, that Richardson could not see the hand come through the hatch, but he could hear it "bust through." Harris, who was the only person in the cell, stabbed J.M. in an area right below the navel, on J.M.'s lower abdomen.  Other officers saw a puncture wound in J.M.'s stomach.

{55} J.M. went to the prison infirmary for medical treatment, who sent him to SOMC.  SOMC in turn transferred him to Grant Hospital in Columbus, where he was transferred to a trauma center.  Two weapons were found in Harris' cell after this incident.  One was a shank made from plexiglass, which had been sharpened to a sharp point.  The other shank was also made of sharpened plexiglass, but had materials from a Bible, string, and a cotton handle.  The State

elicited testimony that those types of weapons can be just as dangerous as metal because the plexiglass can snap off and break, and cannot be retrieved, such that the victim will bleed more.  Additionally, the two weapons used in the April incident were made of materials that would not be detected by a metal detector.

{56} Harris testified on his own behalf.  Harris stated that he had had disciplinary problems in prison in the past, including assaulting a corrections officer, using handcuffs as weapons, and using a knife as a weapon.  As a result, he was transferred to the federal bureau of prisons where he claimed he was treated well by corrections officers.  He was at some point transferred back to the Ohio State Penitentiary ("OSP") in Youngstown, and after having problems there, he was transferred to SOCF.  He claimed that once he arrived at SOCF, he was threatened by staff and mistreated, so he began to file a series of grievances and document everything.

{57} Harris stated that he was placed in a J-1 slammer cell and that he should not have been there because he "didn't do anything."  Then, on March 31, 2021, an inmate named "Frost" told him that the SRT members were tearing his cell up, ripping up papers, etc., during a shakedown.  He acknowledged that he did not want to be removed from his cuffs right away because he wanted to speak to a lieutenant to address the destruction of his property.  When the SRT members would not call the lieutenant, he claims, he snatched the cuffs so they would call the lieutenant.  He claims that he was moving to push the ripped-up items in front of the cell.

**{58}** At some point, he showed one of the corrections officers that someone put a knife in his cell. He said to the CO, "man, you put a knife in my cell, man," but the CO said, "nobody put a knife in your cell," and "just cuff up," while refusing to get a lieutenant. But Harris refused to cuff up because someone put a knife in his cell and refused to call a lieutenant. Harris said he had a knife in his hand, and showed it to the CO. Then Harris said it "dawned in my head" that he could "use this weapon" and "make a scene." He said, "[i]f I put this weapon outside the bars and just wave it around, maybe that will cause some attention." He said he didn't want to hurt anybody and wasn't trying to. He claimed the weapon did not touch C.B. at all. He admitted that he intended to wave the weapon around and "become a threat with that weapon" so he could be transferred elsewhere because he was constantly being harassed.

**{59}** Harris said he also found weapons in his cell on April 11, 2021. He claimed he tried to destroy those plexiglass weapons. On April 12, 2021, the day of the second assault, Harris testified that when he went to get his coffee cup from his cell, the officer jerked away and dropped Harris' tray. Harris denied he used any weapons that day but thought the CO's would say he had done something and had weapons in his cell. As to this incident, Harris also indicated he was not trying to hurt anyone or cause anyone physical harm.

**{60}** Harris claims that he was not acting "knowingly[,]" however, the record shows, based on the surrounding facts, circumstances, and resulting inferences, that he did indeed intend to harm the corrections officers. As to the March incident, involving C.B., the shank's characteristics show that it was

crafted to inflict damage to someone.  The State witnesses at trial conflict with Harris' depiction of simply just "waving around" a knife.  Instead, they say he purposely lured officers close to the cuff port.  Then in a split-second, Harris pulled the knife from his waistband and thrust it through the cuff port.  C.B. testified that it was such a fluid act that Harris had to have practiced it prior to it happening.  Lieutenant Taylor also told the jury that the incident happened very quickly.  Further, Sammons testified that in his 27.5 years of dealing with very dangerous people, it was the fastest he had seen an inmate place his hand through the cuff port, that Harris moved "with a purpose" and that if the weapon had been a quarter of an inch or less nearer to him, it would have gone clear through Sammons' chest cavity.  The video also supports the testimony of the State's witnesses.  Harris' words that day also show that he intended to assault someone, as he said he wanted to "kill" the corrections officers there and made various other threats.

{61} As to the April incident, one can also conclude from observing the weapon's nature that it was designed to be used as a deadly weapon such that jabbing it through a cuff port would result in someone nearby suffering injury. While the incident is difficult to see on the video, State witnesses credibly testified the incident occurred.  The area where the shank punctured J.M. shows that Harris intended to hurt the corrections officer.  A wound is clearly visible in the State's exhibits, even though Harris denies using the weapons on April 12, 2021.  After our review of the record, we cannot find that the jury clearly lost its

way, or that a manifest miscarriage of justice occurred in this case. Hence, we overrule this assignment of error as lacking merit.

FIFTH ASSIGNMENT OF ERROR

{62} In his fifth assignment of error, Harris contends his sentence is contrary to law because the trial court ordered a sentence that was not commensurate with the seriousness of the offense as set forth in R.C. 2929.11(A) such that it violated the purposes of felony sentencing.

{63} The State responds that the sentences are not contrary to law because the trial court considered the principles and purposes of sentencing pursuant to R.C. 2929.11. Additionally, the State says the trial court made the necessary consecutive sentencing findings. Further, the State asserts that while the trial court imposed maximum terms, the sentence was commensurate to the nature of the offenses, warranted based on Harris' history, and allowed by law. In sum, the State maintains Harris has failed to show by clear and convincing evidence that the record does not support the trial court's findings.

A. Law

{64} Appellate courts apply R.C. 2953.08(G)(2) when reviewing felony sentences. R.C. 2953.08(G)(2) provides, in pertinent part:

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
>> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division

> (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

{65} "Ordinarily, appellate courts defer to the broad discretion trial courts have in making sentencing decisions, and R.C. 2953.08(G) also reflects that deference." *State v. Nickell,* 2025-Ohio-1232, ¶ 83 (4th Dist.). This is because "[a] trial judge has the opportunity to preside over the trial, hear witnesses testify, hear the defendant make his allocution directly to the sentencing judge, and hear from the victims at sentencing." *Id.* citing *State v. Blanton,* 2025-Ohio-237, ¶ 30 (4th Dist.), citing *State v. Glover,* 2024-Ohio-5195, ¶ 39. "Thus, appellate courts should possess no inherent right to second guess a felony sentence." *Id.* Except "to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.' " (Citations omitted.) *Id.* citing *Blanton,* citing *State v. Glover*, 2024-Ohio-5195, ¶ 39. Accordingly, the appellate court should give "broad deference to a trial court's sentencing decision and not serve as a 'second-tier' sentencing court." *Id.*, citing *Blanton* at ¶ 30, citing *Glover* at ¶ 39.

{66} In that light, the statute does not allow an appellate court to reverse or modify a sentence on the basis that the trial court abused its discretion. *Id. at* ¶ 85, citing *Blanton* at ¶ 31, and *Glover* at ¶ 45. " 'The plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by the record.' " *State v.*

*Hurst,* 2024-Ohio-5544, ¶ 16 (4th Dist.), quoting *State v. Gwynne,* 2023-Ohio-3851, ¶ 5 (lead opinion). " 'The clear-and-convincing standard for appellate review of R.C. 2953.08(G)(2) is written in the negative.' " *Id.*, quoting *Gwynne* at ¶ 13. "Moreover, 'clear and convincing evidence' is 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *State v. Brummett,* 2025-Ohio-5307, ¶ 33 (4th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### B.  Analysis.

{67} The Supreme Court of Ohio clarified that appellate courts are prohibited from second-guessing a trial court's weighing of the R.C. 2929.11 and R.C. 2929.12 factors:  "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones,* 2020-Ohio-6729, ¶ 42. "In other words, 'R.C. 2953.08(G)(2) does not allow an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12. *State v. Sims,* 2023-Ohio-1179, ¶ 145 (4th Dist.), quoting *State v. Bryant,* 2022-Ohio-1878, ¶ 22.  "Consequently, appellate courts cannot review a felony sentence when 'the appellant's sole contention is that the trial court improperly considered the factors of R.C. 2929.11 or 2929.12

when fashioning that sentence.' " *Id.*, quoting *State v. Stenson,* 2021-Ohio-2256, ¶ 9 (6th Dist.), citing *Jones* at ¶ 42.

{68} A trial court is *not* required to state the reasons for its findings under R.C. 2929.11 or R.C. 2929.12 on the record.  Even though " '[t]he record must indicate that the trial court considered all relevant factors required by R.C. 2929.11 and R.C. 2929.12, the trial court 'has no obligation to state reasons to support its findings.' " *State v. Bolden,* 2025-Ohio-2010, ¶ 8 (8th Dist.), citing *State v. Evans,* 2021-Ohio-1411, ¶ 13 (8th Dist.), citing *State v. Bonnell,* 2014-Ohio-3177, syllabus.  "This is because R.C. 2929.11 and 2929.12 are not fact-finding statutes."  *Id.* citing *State v. Seith,* 2016-Ohio-8302, ¶ 12 (8th Dist.). Instead, "a trial court is required only to 'carefully consider' the factors in R.C. 2929.11 and R.C. 2929.12 when imposing sentence, and is not required to make any 'findings,' or state 'reasons' regarding those considerations."  *State v. Pierce,* 2024-Ohio-82, ¶ 52 (4th Dist.), citing *State v. Mathis,* 2006-Ohio-855, ¶ 38.  In addition, "R.C. 2953.08(G)(2)(b) does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and R.C. 2929.12."  *Id.*, citing *State v. Moore*, 2021-Ohio-3149, ¶ 7 (4th Dist.).

{69} In the case sub judice, at both the sentencing hearing and in its judgment entry, the trial court stated that it considered the R.C. 2929.11 purposes and principles of sentencing and the R.C. 2929.12 seriousness and recidivism factors, properly ordered consecutive sentences, properly applied post-release control, properly advised Harris of the indefinite sentence

notifications, and imposed a sentence which is authorized by law. Therefore, Harris has not established that his sentence is contrary to law, and we overrule his fifth assignment of error.

SIXTH ASSIGNMENT OF ERROR

{70} In his sixth assignment of error, Harris challenges whether the trial court erred when failing to waive the requirement that he pay court costs. He asserts that because he was incarcerated throughout the proceedings and the trial court appointed him counsel during the proceedings, it should not have ordered him to pay costs. The State asserts that the trial court properly ordered court costs because it is required by statute to impose court costs. Further, the State points out that at no time has Harris requested the waiver of court costs.

A. Law

{71} R.C. 2947.23(A)(1)(a) states: "[i]n all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs." The Supreme Court of Ohio has consistently held that "R.C. 2947.23 requires a trial court to assess costs against all criminal defendants, even if the defendant is indigent." *State v. Dean,* 2015-Ohio-4347, ¶ 231, citing *State v. White,* 2004-Ohio-5989, ¶ 8. "Thus, the imposition of court costs on all convicted defendants is mandatory, whether 'indigent or not.' " *State v. Rister,* 2023-Ohio-1284, ¶ 19 (4th Dist.) citing *State v. Taylor,* 2020-Ohio-3514, ¶ 6. Even so, R.C. 2947.23(C) gives a trial court continuing jurisdiction to "waive, suspend, or modify the payment of the costs of prosecution * * * at the time of sentencing or at any time

thereafter." *Id.* "Thus, while the court must impose costs, it may also waive, suspend, or modify them." *Id.,* quoting *Taylor* at ¶ 7.

### B.  Analysis.

**{72}** A review of the record shows that neither a written nor oral motion to waive the costs has ever been filed in this case.  As a result, the standard of review would be plain error.  While Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court," an appellant must first assert that plain error occurred.  To prevail on a claim of plain error Harris must show that "an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise." *State v. Gavin,* 2015-Ohio-2996, ¶ 24 (4th Dist.), citing *State v. Mammone,* 2014-Ohio-1942, ¶ 69; *State v. Leonhart,* 2014–Ohio–5601, ¶ 53 (4th Dist.).

**{73}** Because Harris has not claimed plain error on appeal, we need not consider it. *See State v. Harvey,* 2022-Ohio-2319, ¶ 8 (4th Dist.); *State v. Quarterman*, 2014-Ohio-4034, ¶ 17-20 (appellate court need not consider plain error where appellant fails to timely raise plain-error claim).  Here, Harris has not asserted a plain error argument.  Therefore, we will not create an argument on his behalf. *State v. Smith,* 2017-Ohio-7864, ¶ 16 (4th Dist.), citing *Wright v. Ohio Dept. of Jobs & Family Servs.,* 2013-Ohio-2260, ¶ 22 (9th Dist.) (when an appellant does not argue plain error on appeal, the appellate court will not create an argument on his behalf).

**{74}** Further, because the statute requires the trial court to assess court costs, irrespective of the party's indigency, we cannot find the trial court erred in this regard.   Therefore, we overrule this assignment of error.

CONCLUSION

**{75}** For the foregoing reasons, we find Harris' assignments of error to be without merit and therefore affirm the trial court's judgment in each case.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Abele, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**